## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES ELLIOTT, on behalf of himself and all others similarly situated, | ) Case No.: 2:14-cv-01689-MRH<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| ESB FINANCIAL, INC., HERBERT S. SKUBA, CHARLOTTE A. ZUSCHLAG, JAMES P. WETZEL, JR., MARIO J. MANNA, WILLIAM B. SALSGIVER AND WESBANCO, INC., | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

<u>**TABLE OF CONTENTS**</u>

I.  INTRODUCTION…………………………………………………………………..1

II.  BACKGROUND OF THE LITIGATION AND SETTLEMENT...................................3

III.  ARGUMENT ...........................................................................................................3

    A.  The Standards for Judicial Approval of a Class Action Settlement........................3

    B.  Benefits Obtained........................................................................................6

        1.  The Supplemental Disclosures.................................................................6

            a.  *Selected Comparable Companies Analysis* ....................................8

            b.  *Recent Transaction Analysis* ........................................................13

            c.  *Discounted Dividends Analysis* ..................................................16

            d.  *Financial Projections and Forecasts of ESB*..............................17

    C.  The Settlement is Presumptively Fair because it is the Product of Arm's Length Negotiations and is Supported by Counsel........................................................21

    D.  An Analysis of the *Girsh* Factors Confirms that the Settlement is Fair, Reasonable, and Adequate .................................................................................22

        1.  The Complexity, Expense, and Duration of This Litigation Warrant Approval of the Settlement. ...................................................................22

        2.  The Absence of Objections is Evidence of the Reasonableness of the Settlement …………………………………………………….…..…..23

        3.  The Stage of the Proceedings Weighs in Favor of Approval……………23

        4.  The Risks of Establishing Liability and Damages Weigh in Favor of Approval………………………………………………………………24

        5.  The Risks of Maintaining the Class Action Through Trial Weigh in Favor of Approval………………………………………………………26

        6.  The Settlement is Reasonable in Light of the Ability of Defendants to Withstand a Judgment……………………………………………27

        7.  The Settlement is Reasonable in Light of All the Attendant Risks of Litigation……………………………………………………………...27

E.     The Court Should Certify the Class ...................................................................28

      1.     The Requirements of Fed. R. Civ. P. 23(a) are Satisfied.........................29

           a.     *Numerosity* .....................................................................................29

           b.     *Commonality*..................................................................................29

           c.     *Typicality* .....................................................................................30

           d.     *Adequacy* .....................................................................................30

F.     This Action Meets the Requirements of Fed. R. Civ. P. 23(b)(1) and (2) ............31

IV.     CONCLUSION ...............................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Pages**

Amchem Prods., Inc. v. Windsor,
   117 S. Ct. 2231 (1997) ...............................................................................................29

Bryan v. Pittsburgh Plate Glass Co.,
   494 F.2d 799 (3d Cir. 1974) .......................................................................................4

Carson v. Am. Brands, Inc.,
   450 U.S. 79 (1981) .....................................................................................................4

City of Detroit v. Grinell Corp.,
   495 F.2d 448 (2d Cir. 1974) .......................................................................................5

Ehrheart v. Verizon Wireless,
   609 F.3d 590 (3d Cir. 2010)………..…………………………………………….4

Erie Cnty. Retirees Ass'n v. Cnty. of Erie, Pennsylvania,
   192 F. Supp. 2d 369 (W.D. Pa. 2002) ......................................................................24

Fisher Bros. v. Phelps Dodge Indus., Inc.,
   604 F. Supp. 446 (E.D. Pa. 1985) .............................................................................4

Georgine v. Amchem Prods., Inc.,
   83 F.3d 610 (3d Cir. 1996) .......................................................................................31

Girsh v. Jepson,
   521 F.2d 153 (3d Cir. 1975)…………..………………………………………..…5, 27

Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
   855 F. Supp. 825 (E.D.N.C. 1994)............................................................................5

In re BioClinica, Inc. S'holder Litig.,
   2013 Del. Ch. LEXIS 52 (Del. Ch. Feb. 25, 2013)…………………………………...18

In re Celera Corp. S'holder Litig.,
   59 A.3d 418 (Del. 2012)............................................................................ 12, 32

In re Cendant Corp. Litig.,
   264 F.3d 201 (3d Cir. 2001) ............................................................. 5, 21, 23, 24

In re El Paso Corp. S'holders Litig.,
   41 A.3d 432 (Del. Ch. 2012)……………………………………………………26

In re FLS Holdings, Inc. S'holder Litig.,
   1993 WL 104562 (Del. Ch. Apr. 2, 1993)……………………….…………………………6

In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig. ("GMC Trucks"),
   55 F.3d 768 (3d Cir. 1995) ..............................................................................4, 22

In re Imprelis Herbicide Mktg.,
   296 F.R.D. 351 (E.D. Pa. Oct. 17, 2013).........…………………………….………31

In re The MONY Grp. Inc. S'holder Litig.,

852 A.2d 9, (Del. Ch. 2004)…………………………….…………………………………………..7, 9

In re Netsmart Techs., Inc. S'holders Litig.,
924 A.2d 171 (Del. Ch. 2007)………………………….………………………………………6, 7, 17

In re Portec Rail Prods.,
Cons. N. 10-3547, (C.P. Ct. Allegheny Apr. 21, 2010)………………………………………..6

In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions ("Prudential, II"),
148 F.3d 283 (3d Cir. 1998) ...................................................... 5, 22, 27, 29, 30

In re Prudential Ins. Co. of Am. Sales Practices Litig.,
962 F. Supp. 450 (D.N.J. 1997) .......................................................................28

In re Pure Res., Inc. S'holders Litig.,
808 A.2d 421 (Del. Ch. 2002)……………………………………………………………………7

In re Radiology Assocs., Inc. Litig.,
611 A.2d 485, (Del. Ch. 1991)………………………………………………………………..11

In re Remeron End-Payor Antitrust Litig.,
No. 02-2007(FSH), 2005 WL 2230314 (D.N.J. Sept. 13, 2005)............................21

In re Rent-Way Sec. Litig.,
305 F. Supp. 2d 491 (W.D. Pa. 2003) .................................................. 21, 22, 23, 24

In re Schering-Plough/Merck Merger Litig.,
C.A. No. 09-CV-1099, 2010 WL 1257722 (D.N.J. Mar. 25, 2010) ............................ 28, 30, 32

In re SmithKline Bechman Corp. Sec. Litig.,
751 F. Supp. 525 (E.D. Pa. 1990) .......................................................................23

In re Staples, Inc. S'holder. Litig.,
792 A.2d 934 (Del. Ch. 2001)……………………………………………………………………7

In re Warfarin Sodium Antitrust Litig.,
391 F.3d 516 (3d Cir. 2004) ....................................................................3, 4

In re Wm. Wrigley Jr. Co. S'holders. Litig.,
C.A. No. 3750-VCL, 2009 WL 154380 (Del. Ch. Jan. 22, 2009)............................32

Jewelcor Mgmt. v. Thistle Grp. Holdings, Co.,
No. 2623, 2002 WL 576457 (C.P. Phila. Mar. 26, 2002)…………………………………..6

Little-King v. Hayt Hayt & Landau,
C.A. No. 11-5621, 2013 WL 4874349 (D.N.J. Sept. 10, 2013) ............................31

Maric Capital Master Fund, Ltd. v. Plato Learning Inc.,
11 A.3d 1175, (Del. Ch. 2010)……………………………………………………………..18

Mills v. Elec. Auto-Lite Co.,
396 U.S. 375 (1970).......................................................................................28

Prescott Grp. Small Cap, L.P. v. Coleman Co.,
2004 Del. Ch. LEXIS 131 (Del. Ch. Sept. 8, 2004)…………………………………………..11

Protective Comm. For Indep. Stockholder of TMT Trailer Ferry, Inc. v. Anderson,
    390 U.S. 414 (1968)…………………………………………………………………………4

Reis v. Hazelett Strip-Casting Corp.,
    28 A.3d 442, 477 (Del. Ch. 2011)…………………………………………………………11

State of Wis. Inv. Bd. v. Bartlett, C.A. No. 17727,,
    2002 Del. Ch. LEXIS 42 (Del. Ch. Apr. 9, 2002) ...................................................6

Stoetzner v. Steel Corp.,
    897 F.2d 115 (3d Cir. 1990) ...............................................................................23

Tandycrafts, Inc. v. Initio Partners,
    562 A.2d 1162 (Del. 1989)..................................................................................28

Turberg v. ArcSight,
    C.A. No. 5821-VCL (Del. Ch. Sept. 20, 2011)…………………………………12, 14

Walsh v. Great Atl. & Pac. Tea Co.,
    96 F.R.D. 632 (D.N.J.) .........................................................................................4

Weiss v. Mercedes-Benz of N. Am., Inc.,
    899 F. Supp. 1297 (D.N.J. 1995) ........................................................................27

Weiss v. York Hospital,
    745 F.2d 786 (3d Cir. 1984) ...............................................................................30

Williams v. First Nat'l Bank,
    216 U.S. 582 (1910) .............................................................................................4

Zeidman v. J. Ray McDermott & Co., Inc.,
    651 F.2d 1030 (5th Cir. 1981) ............................................................................30

## Rules and Statutes

Fed. R. Civ. P. 23(a)......................................................................................29, 31

Fed. R. Civ. P. 23(b)(1) and (2) ............................................................................31

Federal Rule of Civil Procedure 23(a) and (b)(3) ................................................3, 29

Federal Rule of Civil Procedure 23(c)(1)................................................................26

Rule 23 of the Federal Rules of Civil Procedure .....................................................28

Rule 23(a)(1)........................................................................................................29

Rule 23(a)(2)........................................................................................................30

Rule 23(b) ............................................................................................................31

Rules 23(b)(1) and (b)(2) .................................................................................31, 32

## Other Authorities

Shannon P. Pratt, *The Market Approach to Valuing Businesses* (2d ed. 2005)......................13, 18

Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers and Acquisitions* (2d ed. 2013) ................................................................. 11, 16, 22

# I.  INTRODUCTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, plaintiff James Elliott ("Plaintiff" or "Elliott"), by his undersigned counsel, without objection from Defendants[1], respectfully submits this Memorandum in support of his Motion for final approval of the settlement ("Settlement") of the above-captioned class action ("Action")[2], as set forth in the Stipulation and Agreement of Compromise and Settlement entered by the parties on April 28, 2015 ("Stipulation").[3]

On July 2, 2015, the Court entered an Order for Notice and Scheduling of Hearing on Settlement ("Scheduling Order"), which, among other things: (i) preliminarily determined, for purposes of settlement, that notice may be disseminated to the Class (defined below); (ii) approved the parties' proposed form and method for disseminating the Notice of Pendency of Class Action, Proposed Settlement of Class Action, Settlement Hearing and Right to Appear ("Notice") to the Class; and (iii) scheduled a final settlement approval hearing (the "Settlement Hearing") for September 21, 2015, at 1:30 p.m.

Plaintiff filed the Action on December 15, 2014 against ESB Financial, Inc. ("ESB" or the "Company"), its Board of Directors (collectively, the "Board" or the "Individual

---

[1] Defendants (defined herein) have no opposition to the Motion for Final Approval and the request sought herein; however, Defendants may not agree with the characterization of certain arguments maintained by Plaintiff herein.

[2] Filed contemporaneously herewith is Plaintiffs' Memorandum of Law in Support of Award of Attorneys' Fees and Reimbursement of Expenses.

[3] The Stipulation is attached as Exhibit 1 to the Declaration of Marc L. Ackerman In Support of Plaintiff's Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees and Reimbursement of Expenses ("Ackerman Declaration," with citations thereto as "Ackerman Decl. __") filed herewith.  All capitalized terms, unless otherwise defined herein, shall have the meaning set forth in the Stipulation.

Defendants"),[4] and WesBanco, Inc. ("WesBanco" or "Parent," and together with ESB and the Board, "Defendants"), challenging the proposed mixed cash-and-stock acquisition of ESB by WesBanco for $1.76 and 0.502 shares of WesBanco common stock in exchange for each share of ESB common stock owned, or approximately $17.65 per ESB common share ("Merger").[5] As set forth below, the Settlement of the Action was reached at a time when Plaintiff and his counsel had a thorough understanding of the strengths and weaknesses of the claims asserted in the Action, and was achieved only after extended arm's-length negotiations. Indeed, before commencing his Action, Plaintiff began the diligent prosecution of his claims by, among other things, making a pre-suit litigation demand on ESB's Board on November 17, 2014 and November 24, 2014,[6] retaining and consulting with a financial and valuation expert, negotiating with ESB and the Board, through their counsel, for the expedited production of relevant non-public information on a voluntary and confidential basis, and receiving and reviewing over 3,800 pages of key internal documents produced by Defendants. Plaintiff also conducted pre-Memorandum of Settlement ("MOS") depositions of two key witnesses.

On January 15, 2015, the parties reached an agreement-in-principle to settle the Action and entered into the MOS. Pursuant to the terms of the MOS, Defendants made certain agreed-

---

[4] The "Board" and "Individual Defendants" refer to, collectively, Raymond J. De Hont, Michael J. Morris, Judith A. Spires, Stanley W. Silverman, George W. Glatfelter II, and Robin L. Weisman.

[5] On November 21, 2014, plaintiff Randall Kress ("Kress," and together with Elliott, "Plaintiffs") filed a substantially similar complaint in Pennsylvania state court ("State Court"), styled *Kress v. ESB Financial, Inc.*, Case No. 11185/14CA. After Plaintiff Elliott filed his action, Kress agreed to discontinue his state court action given the pendency and progress of the Action. The Stipulation was filed on behalf of both the *Kress* and *Elliott* actions.

[6] Specifically, Kress sent his demand letter on November 17, 2014 while Plaintiff Elliott sent his on November 24, 2014.

upon disclosures ("Supplemental Disclosures") to the Schedule 14A Definitive Joint Proxy Statement/Prospectus (the "Proxy"), which ESB filed on Form 8-K with the United States Securities and Exchange Commission (the "SEC") on January 15, 2015, prior to the scheduled ESB shareholder vote in connection with the Merger on January 22, 2015.

Based on a thorough investigation of the claims and allegations asserted in the Action and completion of significant discovery on an expedited basis, which included multiple consultations with a financial and valuation expert retained by Plaintiff, the review of 3,800 pages of relevant internal documents produced by Defendants, and the deposition of two key witnesses, Plaintiff and his counsel believe that the proposed Settlement is fair, reasonable, and adequate to Plaintiff and the Class, which consists of ESB's former unaffiliated shareholders.

For the reasons set forth herein, Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate to the Class and should be approved by the Court. Moreover, the Class meets the requirements of Federal Rules of Civil Procedure 23(a) and (b)(1) and (b)(2), and should be certified by the Court.

## I.      BACKGROUND OF THE LITIGATION AND SETTLEMENT

Plaintiff incorporates the Declaration of Marc L. Ackerman, filed contemporaneously herewith, with respect to the background of the litigation and settlement.

## II.      ARGUMENT

### A.      The Standards for Judicial Approval of a Class Action Settlement

Federal courts favor settlement of class action litigation, given the "overriding public interest in settling [complex litigation]. . . ." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d

516, 535 (3d Cir. 2004); *see also Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).[7] There is an "especially strong" presumption in favor of approval of voluntary settlements in "'class actions . . . where substantial judicial resources can be conserved by avoiding formal litigation.'" *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010).

Rule 23(e) of the Federal Rules of Civil Procedure governs judicial approval for any compromise of claims brought on a class basis. In a class action, the "court plays the important role of protector of the [absent members'] interests, in a sort of fiduciary capacity." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.* ("*GMC Trucks*"), 55 F.3d 768, 784 (3d Cir. 1995); *see also Warfarin*, 391 F.3d at 534. The ultimate determination whether a proposed class action settlement warrants approval resides in the court's discretion. *Protective Comm. For Indep. Stockholder of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).

While the Court has discretion in determining whether to approve a settlement, it should be hesitant to substitute its judgment for that of the parties who negotiated the settlement. *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985). "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *Walsh v. Great Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642-43 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir. 1983). The Court may rely on the judgment of experienced counsel and should

---

[7] Unless otherwise noted, all citations, internal quotations, and footnotes are omitted, and emphasis is added.

avoid transforming the hearing on the settlement into a trial on the merits. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir. 1974); *Walsh*, 96 F.R.D. at 642.

In evaluating whether a class action settlement warrants final approval, the Court must decide whether the proposed settlement is "fair, reasonable, and adequate." *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001); *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 827 (E.D.N.C. 1994). In *Girsh v. Jepson*, the Third Circuit identified nine non-exclusive factors to evaluate the fairness of a proposed settlement:

> (1) [T]he complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability. . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment . . . ; (8) the range of reasonableness of the settlement fund in the light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. . . .

521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). Since then, the Third Circuit has expanded the *Girsh* factors to include additional, non-exclusive factors. *See In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions* ("*Prudential II*"), 148 F.3d 283, 323 (3d Cir. 1998).[8]

---

[8] The *Prudential II* court laid out the following additional factors to be considered by lower courts in determining whether to approve a proposed class settlement:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees

*(cont'd)*

As set forth below, the Settlement is an excellent result, is presumptively fair, and satisfies the *Girsh* factors. Substantial doubt exists as to whether any recovery could have been obtained against Defendants in the absence of the Settlement, especially in light of the uncertainty of prevailing at trial. In short, the Settlement is superior to another very real possibility — little or no recovery whatsoever.

## B. Benefits Obtained

Plaintiff and his counsel sought and obtained material disclosures regarding the process leading up to the Merger Agreement and the analyses of MHH in the form of the Supplemental Disclosures, which addressed Plaintiffs' disclosure claims. *See* Ackerman Decl., Ex. C. As discussed below, the Supplemental Disclosures were material to ESB's shareholders in deciding whether to vote in favor of the Merger. *See, e.g.*, *In re FLS Holdings, Inc. S'holders Litig.*, C.A. No. 12623, 1993 WL 104562, at *280 (Del. Ch. Apr. 2, 1993) ("Improved disclosures may certainly prove beneficial to class members and may constitute consideration of a type which will support a settlement of claims.").

### 1. The Supplemental Disclosures

When directors of corporations seek stockholder action, they are obligated to disclose fully and fairly all material information within their control. *See, e.g., In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 199 (Del. Ch. 2007).[9] While they do not have to provide

_____
*(cont'd from previous page)*
      are reasonable; and whether the procedure for processing individual claims under
      the settlement is fair and reasonable.

148 F.3d at 323.

[9] Delaware law is well developed on corporate law issues such as those presented in this case and in the absence of Pennsylvania authority to the contrary, Pennsylvania courts have found it to be persuasive. *See, e.g., In re Portec Rail Prods.*, Cons. No. 10-3547, 2010 Pa. Dist.

*(cont'd)*

information that is simply "helpful," once directors take it upon themselves to disclose information, that information must not be misleading. *In re The MONY Grp. Inc. S'holder Litig.*, 852 A.2d 9, 24-25 (Del. Ch. 2004). To that end, once directors travel down the road of a "partial disclosure," they become obligated to provide stockholders with an accurate, full, and fair characterization of events. *Id.* at 25; *see also In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 954 (Del. Ch. 2001) ("[D]irectors must also avoid partial disclosures that create a materially misleading impression"). This is specifically the case with disclosures concerning the analyses and opinion of a financial advisor in support of a transaction:

> Once a board broaches a topic in its disclosures, a duty attaches to provide information that is "materially complete and unbiased by the omission of material facts." For this reason, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Only providing some of that information is insufficient to fulfill the duty of providing a "fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the [] board as to how to vote . . . rely."

*Netsmart*, 924 A.2d at 203-04 (citations omitted); *see also In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) ("[I]nvestment bankers' analyses . . . usually address the most important issue to stockholders – the sufficiency of the consideration being offered to them for their shares in a merger or tender offer.").

Plaintiffs alleged that the Proxy omitted material information in connection with the Merger. As discussed below, the Supplemental Disclosures provided previously-omitted,

---

*(cont'd from previous page)*
& Cnty. Dec. LEXIS 157, at *26 (C.P. Ct. Allegheny Apr. 21, 2010) (citing to the law of Delaware, in a context similar to the present, as persuasive authority). *See also Jewelcor Mgmt. v. Thistle Grp. Holdings, Co.*, No. 2623, 2002 WL 576457, at *11-23 (C.P. Phila. Mar. 26, 2002) (citing to Delaware law in the absence of Pennsylvania law on point regarding the soliciting of shareholder votes).

material information, which enabled ESB's shareholders to make their own assessment as to what weight to place on MHH's fairness opinion in deciding how to vote on the Merger.[10]

### a.     *Selected Comparable Companies Analysis*

A selected comparable companies analysis is one of the three valuation analyses typically performed as part of the valuation process for a company, with the other two analyses being precedent transactions and discounted cash flow ("DCF") analyses.  The selected comparable companies analysis is a market approach to valuation, and "[t]he market approach to valuation is relevant because it uses observable factual evidence of actual sales of other properties to derive indications of value."[11]  It uses multiples and a benchmarking process for publicly-traded companies similar to the valuation subject as a basis for determining an appropriate valuation.[12]

In the Proxy, shareholders were not provided with the identities of the publicly traded institutions comprising the group of companies selected by MHH as comparable to ESB (the "ESB Group"), or the publicly traded institutions comprising the group of companies selected by MHH as comparable to WesBanco (the "WesBanco Group").  Instead, the Proxy simply provided an unidentified listing of certain ranges for unspecified companies.  On the other hand, MHH's fairness presentation to the ESB Board actually provided the specific financial institutions that comprised these two groups.  As a result of Plaintiffs' counsel's efforts, the Supplemental Disclosures provided ESB's shareholders with the previously-undisclosed ESB

---

[10] Plaintiff's financial advisor, Matthew R. Morris, CFA, CLP, has submitted an affidavit in support of the Settlement, cited as "Morris Aff." herein.  *See* Ackerman Decl., Ex. E.

[11] Shannon P. Pratt, *The Market Approach to Valuing Businesses*, xxxii (2d ed. 2005).

[12] Morris Aff. at ¶ 11.

Group and WSFS Group members:

> The following publicly traded institutions comprised the group of companies selected by MHH as comparable to ESB (the "ESB Group"): TriState Capital Holdings, Inc.; Peoples Bancorp, Inc.; CNB Financial Corp.; First Defiance Financial; United Community Financial Corp.; Summit Financial Group, Inc.; Premier Financial Bancorp, Inc.; Citizens & Northern Corp.; LNB Bancorp, Inc.; Penns Woods Bancorp, Inc.; First Citizens Banc Corp.; Orrstown Financial Services; LCNB Corp.; Farmers National Banc Corp.; AmeriServ Financial, Inc.; MVB Financial Corp.; ACNB Corp.; and Franklin Financial Services.

> The following publicly traded institutions comprised the group of companies selected by MHH as comparable to WesBanco (the "WesBanco Group"): F.N.B. Corp.; United Bankshares, Inc.; Old National Bancorp; National Penn Bancshares, Inc.; Park National Corp.; First Financial Bancorp; First Commonwealth Financial; Customers Bancorp, Inc.; First Merchants Corp.; 1st Source Corp.; S&T Bancorp, Inc.; Community Trust Bancorp, Inc.; Republic Bancorp, Inc.; Lakeland Financial Corp.; City Holding Co.; and, First Financial Corp.

Ackerman Decl., Ex. C at 5.

The disclosure of the identities of the individual publicly traded banks and thrifts selected by MHH as part of its analysis provided important context for shareholders to evaluate the *Selected Comparable Companies Analyses* performed by MHH. Without even the names of the individual companies, it was impossible to determine which companies MHH considered to be comparable to ESB and WesBanco as part of understanding this analysis.[13] Without knowing what specific companies were reviewed by MHH, there was an incomplete picture of the work performed by MHH at the most fundamental level. *The MONY Grp.*, 852 A.2d at 25. As no two companies are identical, and differences typically exist between a company and its publicly traded peers – sometimes significant differences – knowing the identity of the companies MHH selected was foundational to shareholders understanding this analysis.[14]

---

[13] *Id.* at ¶ 10.

[14] *Id.* at ¶ 12.

Additionally, as part of the Supplemental Disclosures, ESB shareholders were also provided the mean, median, ESB and WesBanco multiples for: (i) price-to-tangible book value; (ii) price-to-last twelve months earnings per share; (iii) the dividend yield; and (iv) the dividend payout ratio. The Supplemental Disclosures also provided benchmarking metrics for each of the selected public companies as well as for ESB and WesBanco, including: (i) return on average assets; (ii) return on average equity; (iii) net interest margin; (iv) noninterest/average assets; (v) efficiency ratio; (vi) tangible common equity/tangible assets; (vii) Tier 1 capital ratio; (viii) loans/assets; (ix) nonperforming asset as a percentage of assets; (x) loan loss reserves as a percentage of gross loans; and (xi) net charge-offs as a percentage of average loans as follows[15]:

| | ESB | ESB Group Mean | ESB Group Median |
|---|---|---|---|
| Return on Average Assets | 0.89% | 0.92% | 0.84% |
| Return on Average Equity | 8.98% | 8.88% | 7.89% |
| Net Interest Margin | 2.58% | 3.44% | 3.53% |
| Noninterest Income / Average Assets | 0.31% | 1.10% | 1.03% |
| Efficiency Ratio | 58.50% | 68.70% | 66.90% |

| | WesBanco | WesBanco Group Mean | WesBanco Group Median |
|---|---|---|---|
| Return on Average Assets | 1.07% | 1.06% | 1.07% |
| Return on Average Equity | 8.79% | 9.04% | 8.79% |
| Net Interest Margin | 3.59% | 3.66% | 3.63% |
| Noninterest Income / Average Assets | 1.11% | 1.15% | 1.10% |
| Efficiency Ratio | 59.70% | 60.50% | 59.70% |

| | ESB | ESB Group Mean | ESB Group Median |
|---|---|---|---|
| Tangible Common Equity / Tangible Assets | 8.60% | 8.90% | 8.60% |
| Tier 1 Capital Ratio | 16.10% | 14.40% | 13.80% |
| Loans/Assets | 36.90% | 65.10% | 69.10% |
| Nonperforming Assets / Assets | 1.05% | 1.84% | 1.52% |
| Loan Loss Reserve / Gross Loans | 0.95% | 1.37% | 1.26% |
| Net Charge-Offs / Avg. Loans | 0.03% | 0.29% | 0.21% |

| | WesBanco | WesBanco Group Mean | WesBanco Group Median |
|---|---|---|---|
| Tangible Common Equity / Tangible Assets | 7.70% | 9.50% | 9.20% |

---

[15] *Id.* at ¶ 13.

| | | ESB Group Mean | ESB Group Median |
|---|---|---|---|
| Tier 1 Capital Ratio | 13.50% | 14.00% | 13.50% |
| Loans/ Assets | 62.90% | 68.80% | 68.80% |
| Nonperforming Assets / Assets | 0.87% | 1.27% | 1.00% |
| Loan Loss Reserve / Gross Loans | 1.16% | 1.24% | 1.17% |
| Net Charge-Offs / Avg. Loans | 0.06% | 0.14% | 0.11% |

| | ESB | ESB Group Mean | ESB Group Median |
|---|---|---|---|
| Stock Price / Tangible Book Value per Share | 138.70% | 127.30% | 126.50% |
| Stock Price / LTM EPS | 13.1x | 14.2x | 13.9x |
| Dividend Yield | 3.10% | 2.70% | 2.80% |
| Last Twelve Months Dividend Payout Ratio | 41.20% | 35.80% | 36.70% |

| | WesBanco | WesBanco Group Mean | WesBanco Group Median |
|---|---|---|---|
| Stock Price / Tangible Book Value per Share | 207.90% | 167.20% | 164.90% |
| Stock Price / LTM EPS | 14.2x | 15.0x | 14.4x |
| Dividend Yield | 2.60% | 3.30% | 3.20% |
| Last Twelve Months Dividend Payout Ratio | 36.80% | 47.10% | 46.80% |

*See* Ackerman Decl., Ex. C at 4-5.

Generally, the disclosure of multiples is material to shareholders because comparable company analyses are market-based valuation techniques, which are "built upon the premise that similar companies provide a highly relevant reference point for valuing a given target."[16]  In other words, these analyses are based on company comparability, and the more similar selected companies are to the subject company, the more reliable the imputed valuation should be.  To this end, the Delaware Court of Chancery has stated that:

> The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison.  At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes.

*In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991); *see also Prescott Grp. Small Cap, L.P. v. Coleman Co.*, 2004 Del. Ch. LEXIS 131, at *81-82 (Del. Ch. Sept. 8, 2004)

---

[16] Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers and Acquisitions*, 113 (2d ed. 2013).

(rejecting comparable company analysis in an appraisal action where "none of [the defendant's expert's] 'comparables' was truly comparable to [the subject company] in any meaningful sense, and none of them had economics similar to [the subject company's]"); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 477 (Del. Ch. 2011) (rejecting comparable companies analysis where the court "lack[ed] sufficient confidence in the comparability of the selected companies"). Consequently, an enhanced understanding of the various comparable companies, as well as their respective market valuations, is material to shareholders in evaluating the resulting indications of value derived by a board's financial advisor. *See Turberg v. ArcSight*, C.A. No. 5821-VCL, at 43 (Del. Ch. Sept. 20, 2011) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be in there, just like they're in there when you give them to the board. . . . [Y]ou would never see a board book that would go to the board without the background multiples."); *In re Celera Corp. S'holder Litig.*, 2012 Del. Ch. LEXIS 66, at *122 (Del. Ch. Mar. 23, 2012), *rev'd in part on other grounds*, 2012 Del. LEXIS 658 (Del. Dec. 27, 2012) ("[A] fair summary of a comparable companies or transactions analysis probably should disclose the market multiples derived for the comparable companies or transactions.").

Here, the mean and median information provided as part of the Supplemental Disclosures provided significant context as to how both ESB and WesBanco compared to their public peers. Given the importance of the benchmarking process described above, this context was important. ESB and WesBanco were both similar to their peers in terms of Return on Assets and Return on Equity. Where they differed is that ESB was far more efficient of an operator than WesBanco by virtue of its low efficiency ratio. Where ESB suffered is in the form of lower net interest margin percentage, but what was most striking about that was that ESB had a loan/assets ratio far below WesBanco or its peer group. This is an indicator there was relatively more untapped potential

for new loans and net interest income available at ESB compared to WesBanco. The natural question thus begged is whether ESB's financial results and its forecasts fully reflected the earnings power of its assets. This dynamic was reinforced when considering ESB's higher-than-average capital ratios (a sign of financial strength) but also its unusually low charge-off rate. This indicates ESB was not taking enough credit risk in its loan portfolio, which largely contributed to the low net interest margin.[17]

WesBanco's book value multiples were high compared to both its peers and to ESB. When considered in combination with the above, this suggested there was less upside to WesBanco's financial performance and its valuation than for ESB, which is important given that the vast majority of the Merger consideration was in WesBanco shares. These differences also reinforced the need to know the identities of the peer companies MHH used as a part of its analysis of ESB and WesBanco.[18]

Based on the above, these Supplemental Disclosures were material and provided a more complete picture of the work done by MHH in evaluating ESB and WesBanco in relation to their respective market peers.[19]

b.    *Recent Transactions Analysis*

A precedent transactions analysis also is one of the three primary valuation analyses typically performed by financial advisors. Like the selected comparable companies analysis, a precedent transactions analysis is a market approach to valuation. "The basic principles of the transaction method are the same as for the guideline publicly traded company method. The

---

[17] Morris Aff., ¶ 14.

[18] *Id.* at ¶ 15.

[19] *Id.* at ¶ 16.

differences in implementation are a result of the differences in data available and, in some cases, the structure of the transactions."[20]   In the case of the precedent transactions analysis, the financial advisor typically reviews observable transaction metrics, including valuation multiples and the characteristics of the comparable target companies, to determine an appropriate multiple by which to value the subject company.[21]

Shareholders were not provided with any information regarding the observed multiples from the set of comparable transactions as part of the Proxy.  *See Turberg*, C.A. No. 5821-VCL, at 43; *Celera*, 2012 Del. Ch. LEXIS 66, at *122 ("[A] fair summary of a comparable . . . transactions analysis probably should disclose the market multiples derived for the comparable [] transactions.").   As a result, shareholders had no basis against which to evaluate the ranges of multiples selected and applied by MHH in this analysis, or the resulting indications of value.  As part of the Supplemental Disclosures, shareholders were informed of the following median values of the medians for the groups of transactions: price to prior market price premium of 18%, price to tangible book value of 164.2%, price to last twelve months earnings per share of 19.6%, price to assets of 16.9%, and tangible book premium to core deposits of 10.8%.   Ackerman Decl., Ex. C at 6.  Additionally, the selected median benchmarking financial data for the group of listed acquirees was disclosed as follows[22]:

Nationwide transactions since January 1, 2012, deal value between $250 million and $350 million, and non-performing assets as a percentage of assets less than 5.0%:

---

[20] Pratt, *supra*, at 35.

[21] Morris Aff., ¶ 16.

[22] Morris Aff., ¶ 17.

| Total Assets ($000s) | Equity/ Assets | ROAA | ROAE | NPAs/Assets |
|---|---|---|---|---|
| $ 1,711,937 | 11.07% | 0.75% | 6.50% | 1.39% |

Nationwide transactions since January 1, 2012, assets between $1 billion and $5 billion, and non-performing assets as a percentage of assets greater than 5.0%:

| Total Assets ($000s) | Equity/ Assets | ROAA | ROAE | NPAs/Assets |
|---|---|---|---|---|
| $ 1,601,683 | 10.35% | 0.80% | 7.90% | 1.54% |

Pennsylvania, Maryland, Ohio and West Virginia transactions since January 1, 2012, assets greater than $100 million, and non-performing assets as a percentage of assets less than 5.0%:

| Total Assets ($000s) | Equity/ Assets | ROAA | ROAE | NPAs/Assets |
|---|---|---|---|---|
| $ 238,750 | 9.55% | 0.60% | 6.00% | 1.25% |

Nationwide transactions since January 1, 2012, return on average assets greater than 0.75%, and non-performing assets as a percentage of assets less than 1.5% ("Performance Based Group"):

| Total Assets ($000s) | Equity/ Assets | ROAA | ROAE | NPAs/Assets |
|---|---|---|---|---|
| $ 1,824,623 | 9.94% | 1.18% | 11.60% | 1.08% |

Ackerman Decl., Ex. C at 6.

The median financial data provided for the groups of target companies was material to ESB's shareholders because it provided a better understanding of the scope of work performed by MHH in arriving at its fairness opinion. Specifically, the disclosure of median assets, equity to assets, return on average assets ("ROAA"), return on average equity ("ROAE"), and non-performing assets ("NPA") to assets illustrated the operating metrics reviewed by MHH in performing its analyses and benchmarking ESB to the different groups of recent transactions it reviewed. This Supplemental Disclosure allowed shareholders to better compare ESB in relation to the recent transactions, evaluate whether the multiples being received by ESB were

appropriate based on ESB's comparability to the specific transactions included as part of this analysis, and evaluate which transactions were the most relevant to the Merger. In reviewing the median metrics disclosed, it appears ESB more closely resembles the Performance Based Group than any of the other transaction groups identified by MHH. This was particularly telling in that this transaction group was acquired at the highest multiples of tangible book value and nearly the highest as a percentage of assets. In this context, the Supplemental Disclosure aided ESB shareholders in assessing the merits of the Merger as compared to transactions involving the most similar financial institutions.[23]

### c. *Discounted Dividends Analysis*

As part of the Supplemental Disclosures, shareholders were also informed that the perpetuity growth rate of 5.0% applied after 2016 was applied by MHH "after discussions with ESB's senior management." Ackerman Decl., Ex. C at 7. Additionally, shareholders were informed that "[i]n performing its discounted dividends analysis, MHH assumed an implied perpetuity growth rate of 5.0%. In determining cash flows available to shareholders, MHH assumed that ESB would maintain a tangible common equity to tangible asset ratio of 6.5% (which MHH deemed a reasonable level of capital for ESB to maintain while permitting a satisfactory return on investment to shareholders) and would "retain sufficient earnings to maintain that level." *Id.* Shareholders already knew MHH assumed that ESB would maintain a tangible common equity to tangible asset ratio of 6.5%. The Supplemental Disclosure clarified that, in performing its Discounted Dividends Analysis, MHH assumed a 5.0% implied perpetuity growth rate. MHH selected and applied multiples ranging from 10.0x to 16.0x 2019 projected earnings and premiums ranging from 130% to 190% of 2019 projected tangible book value in

---

[23] Morris Aff., ¶ 23.

calculating the terminal value of ESB. The summary of MHH's Discounted Dividends Analysis on the November 20, 2014 WesBanco S-4 filing did not describe the reasoning and assumptions made by MHH in selecting these terminal multiples and premiums.[24]

This Supplemental Disclosure was material because it described that MHH assumed a perpetuity growth rate in its analysis when selecting and applying multiples to calculate a terminal value. "There are two widely accepted methods used to calculate a company's terminal value – the exit multiple method [EMM] and the perpetuity growth method [PGM]. Depending on the situation and company being valued, the banker may use one or both methods, *with each serving as a check on the other*."[25] (Emphasis added) The Supplemental Disclosure that MHH assumed a specific implied perpetuity growth rate demonstrates MHH recognized the conceptual-mathematical relationship between its Discounted Dividends Analysis inputs. Without this Supplemental Disclosure, shareholders were left unaware of a key assumption made by MHH – the implied perpetuity growth rate – in selecting multiples for calculating the terminal value using the exit multiple method. This assumption was particularly important as it demonstrated the applied earnings multiples and tangible book value premiums were selected by MHH under the assumption ESB would grow into perpetuity at 5.0%.[26]

### d. *Financial Projections and Forecasts for ESB*

Courts have held that the disclosure of financial projections and forecasts is material because they provide stockholders with a basis to project the future financial performance of a company and allow them to better understand the financial analyses performed by the company's

---

[24] Morris Aff., ¶¶ 24-25.

[25] Rosenbaum, *supra*, at 148.

[26] Morris Aff., ¶¶ 26-27.

financial advisor in its fairness opinion. *See, e.g., Netsmart*, 924 A.2d at 201-03 ("[P]rojections of this sort are probably among the most highly-prized disclosures by investors. . . . What they cannot hope to do is replicate management's inside view of the company's prospects."). *See also Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178-79 (Del. Ch. 2010) (holding that "management's best estimate of the future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information."); *In re BioClinica, Inc. S'holder Litig.*, 2013 Del. Ch. LEXIS 52, at *18 (Del. Ch. Feb. 25, 2013) (holding that management's projections of the future value of the company are valuable to a stockholder when deciding whether to exchange his or her ownership for the consideration offered). Through the Supplemental Disclosures, shareholders were provided with significant detail on the Company's expected growth, future profitability, and future financial position, as follows[27]:

Projected Selected Balance Sheet Data

| | Fiscal Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | | 2015 | | 2016 | |
| Assets: | (Dollars in Thousands) | | | | | |
| Cash and cash equivalents | $ | 16,720 | $ | 16,720 | $ | 16,720 |
| Available for sale securities | | 1,097,134 | | 1,116,029 | | 1,126,707 |
| Total net loans | | 713,515 | | 754,450 | | 801,445 |
| Real estate owned and held for investment | | 7,700 | | 6,700 | | 5,700 |
| Goodwill | | 41,599 | | 41,599 | | 41,599 |
| Fixed assets | | 13,001 | | 12,963 | | 12,788 |
| Interest receivable | | 7,340 | | 7,340 | | 7,340 |
| Bank owned life insurance | | 31,103 | | 31,623 | | 32,123 |
| Total assets | $ | 1,955,346 | $ | 2,015,035 | $ | 2,072,533 |
| | | | | | | |
| Liabilities: | | | | | | |
| Total deposits | | $1,314,561 | | $1,380,258 | | $1,449,276 |
| Long term debt | | 371,929 | | 355,644 | | 334,307 |
| Subordinated debt | | 36,083 | | 36,083 | | 36,083 |
| Total liabilities | $ | 1,746,662 | $ | 1,796,860 | $ | 1,844,541 |
| | | | | | | |
| Stockholders' Equity: | | | | | | |

---

[27] *Id.* at ¶ 28.

| | Common stock | $192 | | $192 | | $192 |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Common stock | | $192 | | $192 | | $192 |
| Paid in capital | | 104,433 | | 104,478 | | 104,516 |
| Treasury stock | | (17,500) | | (20,000) | | (22,500) |
| Retained earnings | | 108,189 | | 119,207 | | 131,261 |
| Accumulated other comprehensive income, net of tax | | 15,573 | | 15,573 | | 15,573 |
| Total stockholders' equity | $ | 209,734 | $ | 219,225 | $ | 229,042 |
| Total liabilities and stockholders' equity | $ | 1,955,346 | $ | 2,015,035 | $ | 2,072,533 |

Projected Selected Income Statement Data

| | | Fiscal Year Ended December 31, | | |
|---|---|---|---|---|
| | Six Months Ended December 31, 2014 | 2014 | 2015 | 2016 |
| | | (Dollars in Thousands) | | |
| Total interest income | $32,379 | $64,873 | $67,191 | $72,991 |
| Total interest expense | 8,416 | 17,671 | 17,079 | 20,502 |
| Net interest income | 23,963 | 47,202 | 50,112 | 52,489 |
| Less: Provision for loan losses | 300 | 360 | 800 | 900 |
| Net interest income after provision for loan losses | 23,663 | 46,842 | 49,312 | 51,589 |
| Total noninterest income | 3,115 | 6,280 | 5,748 | 5,791 |
| Total noninterest expense | 15,526 | 30,427 | 31,734 | 32,833 |
| Income before income taxes | 11,252 | 22,695 | 23,326 | 24,547 |
| Net income attributable to ESB | $8,691 | $17,731 | $18,082 | $19,081 |
| Diluted earnings per share | $0.49 | $1.00 | $1.02 | $1.09 |
| Dividends per common share | $0.20 | $0.40 | $0.40 | $0.40 |

The diluted earnings per share, when considered in conjunction with the 5.0% perpetuity growth rate provided as part of the Supplemental Disclosures, provided significant information to evaluate MHH's Discounted Dividends Analysis when using P/E multiples. Moreover, the disclosure of the remaining projections was notably important because, as Company management was ostensibly in the best position to know, shareholders would have no other way to discern this data but for the Supplemental Disclosure. Specifically, the slow projected growth in total interest income, a jump in loan loss provisions, and a decline in non-interest income

projected for 2015 appeared unrealistic when juxtaposed against ESB's already-below average net interest margin and deployed capital ratios. If anything, there should likely have been substantial upside to ESB's future earnings growth working off such a low base. It was also unlikely that ESB's loan loss provision would experience such a large jump without the Company materially increasing its credit exposure. However, if that were the case, then the benefits should be seen in boosted net interest margin and/or non-interest income, which was not the case. These projections appeared simply to be a continuation of ESB's current underperformance relative to peers. If anything, ESB's future profitability and potential dividend growth appeared greater than many of its comparable peers, and perhaps that of the projections utilized by MHH under the discounted dividend model.[28]

In summary, and as set forth in the Morris Affidavit, "[w]hile the quantitative value of the information contained in the Supplemental Disclosures is not readily ascertainable, this information plays a meaningful role in investment decisions. Individually and collectively, the financial disclosures described herein were essential to understanding the financial analyses prepared by the Financial Advisor. Specifically, the combination of the disclosure of the operating metrics from the comparable companies identified by MHH along with the projections allows shareholders to benchmark ESB against its peers and conduct a strengths, weaknesses, opportunities and threats analysis ("SWOT"). In this particular circumstance, based on ESB's superior efficiency ratio and stronger capital position relative to peers and its substantially below average credit risk and net interest margin, this indicates ESB may have better future earnings prospects and, therefore, a higher value than MHH concluded in its Fairness Presentation. Similarly, through the Supplemental Disclosure, ESB shareholders were able to conclude the

---

[28] *Id.* at ¶ 29.

Company closely resembled the Performance Based Group of transactions, which carried higher valuation multiples than the other groups to which MHH compared the Company. Lastly, the Supplemental Disclosure raised questions regarding the high valuation of the WesBanco shares that ESB shareholders would receive under the Merger. As such, the Supplemental Disclosures represented a substantial benefit to ESB's shareholders in their evaluation of the Merger and the consideration it offered." [29]

### C. The Settlement is Presumptively Fair because it is the Product of Arm's Length Negotiations and is Supported by Counsel

The Third Circuit "affords an initial presumption of fairness for a settlement 'if the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *In re Remeron End-Payor Antitrust Litig.*, No. 02-2007(FSH), 2005 WL 2230314, at *15 (D.N.J. Sept. 13, 2005) (quoting *Cendant,* 264 F.3d at 233 n.18). Each of these factors weighs in favor of the presumption of fairness of this Settlement. The Settlement is the product of arm's-length negotiations between experienced and capable counsel after significant investigation and litigation. The principal lawyers involved in the settlement negotiations have many years of experience in the effective prosecution, defense, and resolution of complex actions. Importantly, the parties only reached an agreement-in-principle to settle after comprehensive discovery of over 3,800 pages of non-public documents, two depositions, and consultation with a financial and valuation expert. Finally, as of the date of this filing, counsel are not aware of any objections by Class members.

---

[29] *Id.* at ¶ 30.

Plaintiffs' counsel's "assessment of the settlement as fair and reasonable is entitled to considerable weight." *In re Rent-Way Sec. Litig.,* 305 F. Supp. 2d 491, 509 (W.D. Pa. 2003). Plaintiffs' counsel, who have substantial experience prosecuting and litigating class actions, believe that the Settlement is an excellent result for the Class. In reaching this conclusion, Plaintiffs' counsel considered the strength of Plaintiffs' claims, the risks of establishing liability and damages at trial, and the risk that a fact finder may have ruled in favor of Defendants on some or all of the major issues, resulting in no recovery for the Class.

### D. An Analysis of the *Girsh* Factors Confirms that the Settlement is Fair, Reasonable, and Adequate

#### 1. The Complexity, Expense, and Duration of This Litigation Warrant Approval of the Settlement

As noted above, settlements of disputed class action claims are favored by courts to avoid the high costs of continued litigation. *See GMC Trucks*, 55 F.3d at 784. Therefore, the first *Girsh* factor reflects "'the probable costs in both time and money, of continued litigation.'" *Id.* at 812. The purpose of considering this factor is to determine the extent of the benefit that would be gained from settling the claim amicably. *GMC Trucks*, 55 F.3d at 812. *See also Prudential II*, 148 F.3d at 318 ("[T]he trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement.").

In the absence of the Settlement, this case would have necessitated complex, expensive, and lengthy litigation against Defendants. Defendants have defended, and intended to continue to defend, this litigation vigorously. If the litigation continued, the parties would have to draft and research comprehensive briefs related to motions to dismiss and motions for summary judgment, potentially followed by expert discovery, additional document production and

depositions, and by trial. In short, the Settlement secures a substantial recovery for the Class without the delays, risks, and uncertainties of continued litigation. *See also Rent-Way*, 305 F. Supp. 2d at 501.

### 2. The Absence of Objections Is Evidence of the Reasonableness of the Settlement

It is well settled that the absence of objections to a proposed class action settlement is strong evidence that the settlement is fair and reasonable. *See Stoetzner v. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (concluding that, when "only" 29 members of a class of 281 objected, the response of the class as a whole "strongly favors settlement"); *In re SmithKline Bechman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990). In accordance with the Court's Scheduling Order dated July 2, 2015 (Ackerman Decl, Ex. D), ESB was directed to mail copies of the Notice to all members of the Class at their last known address appearing in records maintained by or on behalf of ESB. The Notice informed Class members of their right to object to any aspect of the Settlement. The deadline for Class members to file objections to the Settlement has not yet expired; however, Plaintiffs' counsel are not aware of any objections to any aspect of the Settlement to date. ESB will file with the Court proof, by affidavit, of mailing of the Notice at least ten business days before the Settlement Hearing. Approval of the proposed Settlement, therefore, is supported by the second *Girsh* factor.

### 3. The Stage of the Proceedings Weighs in Favor of Approval

The third *Girsh* factor requires the Court "to consider the degree to which the litigation has developed prior to settlement." *Rent-Way,* 305 F. Supp. 2d at 502. "The goal here is to determine 'whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *Id.* (quoting *Cendant*, 264 F.3d at 235). Here, counsel had a firm understanding of the merits of the case at the time the Settlement was reached.

The parties reached this Settlement after Plaintiffs sent the Demand Letters to the Board challenging the fairness of the then-proposed Merger and requesting the Board to take remedial action. Plaintiffs subsequently initiated the Action, and after arm's-length negotiations Defendants produced more than 3,800 pages of relevant, internal ESB documents to Plaintiffs. Plaintiffs took the depositions of Zuschlag and Losty. Plaintiffs further consulted with an independent financial and valuation expert to further assess the impact of various facts disclosed during discovery on the issue of what price was truly fair and adequate for ESB's shares. This factor favors approval of the proposed Settlement.

### 4. The Risks of Establishing Liability and Damages Weigh in Favor of Approval

Plaintiffs recognize that a finding of liability in the Action was by no means certain and, as in every complex case of this kind, Plaintiffs faced formidable obstacles to proving Defendants' liability. The Court should attempt to balance the likelihood of success at trial against the benefits of immediate settlement. *Rent-Way,* 305 F. Supp. 2d at 504. The Court should also "attempt [] to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 238; *Rent-Way*, 305 F. Supp. 2d at 505; *Erie Cnty. Retirees Ass'n v. Cnty. of Erie, Pennsylvania*, 192 F. Supp. 2d 369, 375 (W.D. Pa. 2002). The complexities, uncertainties, and procedural posture of this litigation warrant approval of the Settlement.

The risks faced by Plaintiffs in establishing liability demonstrate that the Settlement provided the Class with a significant benefit that was not only fair, reasonable, and adequate, but achieved a favorable result. While Plaintiffs' counsel believe that the claims asserted had merit, the complexities and uncertainties of this litigation warrant approval of the Settlement. In particular, Plaintiffs and their counsel recognized that they would have had to surmount

significant obstacles to achieve a monetary recovery for the Class if the case were tried, with the distinct possibility that any relief, even if Plaintiffs prevailed, might well have provided Class members with less value than they have received as a result of the Settlement.

In addition to the disclosure claims, Plaintiffs alleged, among other things, that the Merger consideration was inadequate and that the Merger was the product of a flawed process designed to ensure the sale of ESB on terms preferential to WesBanco, but detrimental to Plaintiffs and the Class. Plaintiffs also asserted that the Merger Agreement contained improper deal protection provisions that locked up the Merger in favor of WesBanco, including: (i) a "no solicitation" provision that constrained the Individual Defendants' ability to communicate and negotiate with potential buyers who wished to submit or had submitted unsolicited alternative proposals; (ii) a "matching rights" provision that required the Company to provide WesBanco with the opportunity to match any superior proposals; and (iii) a termination fee of $11,354,000.

Plaintiffs believe that these claims were meritorious when filed, but there remained substantial risks against establishing liability at trial or in the face of any potential summary judgment motion. To establish their claims, Plaintiffs would have argued that: (i) at all relevant times, the Individual Defendants owed fiduciary duties to ESB's stockholders; (ii) the Individual Defendants breached those duties by engaging in a flawed process and agreeing to a transaction that offered inadequate value; and (iii) the other Defendants aided and abetted those breaches of fiduciary duties.

Defendants could and likely would have sought to demonstrate, among other things, that the Company retained independent legal and financial advisors, and at the end of the process, MHH rendered a fairness opinion regarding the Merger consideration before the Board approved the Merger. It is likely that Defendants would have further argued that the deal protection

devices were reasonable under the circumstances; that no alternative transaction emerged offering greater value to ESB's stockholders than the Merger; and that ESB's stockholders received fair consideration and no stockholder was damaged by the Individual Defendants' conduct.

Courts have held that, in a change of control transaction, a board need only conduct a reasonable sales process, not a perfect one. *See, e.g., In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 Del. Ch. LEXIS 79, at *62 (Del. Ch. May 20, 2011). Moreover, whether the Merger consideration sufficiently valued ESB was a complex matter and there was substantial evidentiary support for Defendants' argument that the Board's decision to accept WesBanco's offer was a fully defensible business judgment. In any event, Plaintiffs' valuation expert determined that he would have had difficulty demonstrating that the Merger consideration fell outside the range of fairness. Thus, even if Plaintiffs were able to persuade the Court that there was some deficiency in the process that produced the Merger Agreement, Plaintiffs could not realistically have expected to recover a money judgment in favor of the Class. Further, no rival bidder emerged at the time of the Settlement, making the prospect of securing an injunction (on grounds other than disclosures) dim. *See, e.g., In re El Paso Corp. S'holders Litig.*, 41 A.3d 432, 449-52 (Del. Ch. 2012).

In recognition of these factors, Plaintiffs' counsel secured the Supplemental Disclosures ahead of the ESB Shareholders' Meeting, which remedied the various misleading statements and omissions identified by Plaintiffs. Plaintiffs' counsel's efforts resulted in a significant measure of protection and benefit to the Class. Based upon their investigation, discovery efforts, and analysis of applicable legal principles, Plaintiffs and their counsel concluded that the Supplemental Disclosures provide ample consideration for the Settlement and release of the

claims in this lawsuit, given the substantial risks, costs, and uncertainties of continued litigation. Accordingly, Plaintiffs respectfully submit that this Court should grant final approval of the Settlement.

5. **The Risks of Maintaining the Class Action Through Trial Weigh in Favor of Approval**

Federal Rule of Civil Procedure 23(c)(1) provides that class certification orders may be altered or amended any time before a decision on the merits. Thus, in any class action suit, there is always a risk that a class will be modified or decertified prior to a decision on the merits.

6. **The Settlement Is Reasonable in Light of the Ability of Defendants to Withstand a Judgment**

ESB is no longer an independent company. Moreover, the available directors' and officers' liability insurance policies were being depleted by continued litigation, limiting the potential for meaningful recovery. Therefore, even if Plaintiffs succeeded at a trial of this Action several years from now, there is no guarantee of a better recovery than that provided by this Settlement.

7. **The Settlement Is Reasonable in Light of All the Attendant Risks of Litigation**

The Settlement must be balanced against all the risks of continued litigation. Here, the Court should weigh whether the proposed Settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case when to trial. *See Prudential II*, 148 F.3d at 322. When evaluating the range of reasonableness, both in light of the best possible recovery (*Girsh* factor 8) and in light of the attendant risks of litigation (*Girsh* factor 9), courts should consider that plaintiffs and the class often face the risk of receiving nothing at all. *See Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1300-01 (D.N.J. 1995), *aff'd mem.*, 66 F.3d 314 (3d Cir. 1995) ("when parties negotiate a settlement they have far greater control of

their destiny than when a matter is submitted" to a fact-finder).

Here, the Settlement gave ESB shareholders immediate benefits while avoiding the risk of continued litigation that could have resulted in significantly less relief for the Class or no relief at all. The Supplemental Disclosures made by Defendants as a result of the Action, touching both the financial fairness of the consideration offered and the procedural fairness of the Merger, are both material and significant. Disclosures such as those obtained here have routinely provided the basis for the resolution of shareholders' claims. *See, e.g., In re Schering-Plough/Merck Merger Litig.*, C.A. No. 09-CV-1099, 2010 WL 1257722, at *15 (D.N.J. Mar. 25, 2010) ("*Merck*") (approval of disclosure-only settlement that promoted "corporate suffrage"); *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989) (approving settlement consisting of a "heightened level of corporate disclosure").

In *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970), the United States Supreme Court observed that "regardless of the relief granted, private shareholders' actions of this sort involve corporate therapeutics, and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute." Thus, while Plaintiffs' claims were meritorious when filed, through their counsel's investigation and consultation with their financial expert, Plaintiffs' counsel concluded that the risks of further litigation were substantial and they would have had to surmount significant obstacles to achieve a monetary recovery for the Class if the Action was ultimately tried. The Supplemental Disclosures obtained by virtue of the Settlement ensured that ESB stockholders would receive meaningful and timely relief on the disclosure claims. In light of the risks of further litigation and the significant benefits achieved through the Settlement, the Settlement falls within the range of reasonableness and should be approved by the Court.

## E.     The Court Should Certify the Class

Class actions created for the purpose of settlement are well recognized under Rule 23 of the Federal Rules of Civil Procedure.  *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (D.N.J. 1997).  The Scheduling Order entered by the Court on July 2, 2015 made a preliminary determination regarding class certification such that Notice could be disseminated.  Plaintiffs respectfully submit that certification of the Class for settlement purposes pursuant to Rules 23(a) and (b)(1) and (b)(2) of the Federal Rules of Civil Procedure is appropriate.[30]

### 1.     The Requirements of Fed. R. Civ. P. 23(a) are Satisfied

Federal Rule of Civil Procedure 23(a) contains four requirements for certification: numerosity, commonality, typicality, and adequacy of representation to certify a class.  *See Amchem Prods., Inc. v. Windsor*, 117 S. Ct. 2231, 2248 (1997); *Prudential II*, 148 F.3d at 307-08.

---

[30] The parties stipulated to the certification of the following non-opt-out Settlement Class for purposes of Settlement only:

> [A]ny and all persons or entities who held ESB Financial Corporation ("ESB") common shares at any time between October 29, 2014 and February 10, 2015, either of record or beneficially, including any and all of their respective successors-in-interest, predecessors, representatives, trustees, executors, administrators, heirs, assigns, or transferees, whether immediate and remote, and any person or entity acting for or on behalf of, or claiming under any of them, and specifically including Plaintiffs, but excluding Defendants, their subsidiary companies, affiliates, assigns, and members of their immediate families, as the case may be (the "Class").

## 1. Numerosity

With respect to numerosity, "Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable." *See Prudential II*, 148 F.3d at 309; *Weiss v. York Hospital*, 745 F.2d 786, 809 n.35 (3d Cir. 1984) (numbers exceeding one hundred will generally sustain numerosity requirement), *cert. denied*, 470 U.S. 1060 (1985). As of October 31, 2014, there were 17,839,439 ESB shares issued and outstanding. It is likely that the number of Class members is in the thousands, easily satisfying the numerosity requirement. *See Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981) (assumption that numerosity is satisfied is reasonable where class is "composed of sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded").

## 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In corporate takeover cases, the commonality requirement is axiomatic. In *Merck*, which also involved class litigation concerning a proposed merger, the court held that the commonality requirement was satisfied where:

> A common question of fact concerns whether disclosures, pertaining to the proposed Merger, provided to shareholders for the purpose of voting upon the Schering/Merck merger were adequate. Further, a common question of law concerns whether the members of the board breached fiduciary duties owed to shareholders in consummating the proposed Merger.

2010 WL 1257722, at \*6. This Action similarly presents common questions of, *inter alia*, whether: (i) the disclosures made by Defendants in public filings issued in connection with the Merger contained materially false, misleading, or omissive information; (ii) Defendants breached their fiduciary duties to the Class members or aided and abetted any such breaches; and (iii) the

Class members were injured as a consequence of Defendants' alleged breaches of fiduciary duties.

### 3. *Typicality*

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996). Here, all ESB shareholders are affected equally by the Merger and all Class claims arise from the actions of the ESB Board in approving the Merger and their public disclosures in connection therewith. Plaintiffs' claims and the claims of the Class are based on the same legal theory. Thus, typicality is satisfied.

### 4. *Adequacy*

Adequacy of representation requires the interests of the proposed representative to be aligned with those of the absentee class members and the proposed class counsel to be qualified and generally able to conduct the litigation in the interest of the entire class. *See id.* at 630. "This means both that class representatives do not have interests antagonistic to the class and that class counsel are sufficiently skilled and experienced to litigate the case." *In re Imprelis Herbicide Mktg.*, MDL No. 2284,11-md-02284, 296 F.R.D. 351, at *360 (E.D. Pa. Oct. 17, 2013). The first element of this test is satisfied here, where Plaintiffs' interests are aligned with those of the Class and "[t]here is no evidence of apparent conflicts" between Plaintiffs and other Class members. *Id.* at *361; *Little-King v. Hayt Hayt & Landau*, C.A. No. 11-5621, 2013 WL 4874349, at *6 (D.N.J. Sept. 10, 2013). With respect to the second element, proposed class counsel, Brodsky & Smith LLC and the Law Office of Alfred Yates, Jr., P.C., are well qualified and experienced in shareholder class actions and corporate matters such as this. *See* Ackerman Decl., Ex. F (attaching respective firm résumés). Plaintiffs' counsel began aggressively pursuing

the Class claims even before commencing the Action, making a litigation demand upon the Board, and continued to vigorously prosecute the Action thereafter, engaging in significant discovery, negotiating the Settlement, and obtaining valuable relief on behalf of all Class members. Given the lack of conflict, the retention of competent counsel, and efforts in litigating this matter, Plaintiffs have been and will remain adequate class representatives through the pendency of this matter.

Accordingly, the proposed Class satisfies all of the requirements of Rule 23(a).

**F.      This Action Meets the Requirements of Fed. R. Civ. P. 23(b)(1) and (2)**

In addition to meeting all of the requirements of Rule 23(a), when at least one of the requirements of Rule 23(b) is met, a non-opt out class is appropriate. Corporate takeover litigation is perfectly suited to meet the additional elements of both Rules 23(b)(1) and (b)(2). Here, Plaintiffs challenged Defendants' conduct in connection with the negotiation and entry into the Merger Agreement and alleged that the disclosures in connection therewith were inadequate. Certification is proper under Rules 23(b)(1) and (b)(2) because: (i) the prosecution of individual actions would be dispositive of interests of absent Class members; (ii) Defendants' actions in connection with the Merger are and were generally applicable to all ESB shareholders; and (iii) the primary relief sought by Plaintiffs in the Action was injunctive. *See Merck*, 2010 WL 1257722, at *8 (finding Rule 23(b)(1) and (b)(2) satisfied because "there is significant risk that [defendant] will be exposed to differing standards of conduct with respect to a group that is owed a duty of uniform treatment pursuant to applicable securities laws and regulations as well as fiduciary obligations. . . . Indeed, the underlying factual circumstances revolve around Defendants' conduct towards prospective class members, specifically with respect to disclosures advanced and the circumstances surrounding the consummation of the Merger."); *In re Celera*

*Corp. S'holder Litig.*, 59 A.3d 418, 432-33 (Del. 2012) ("courts have 'repeatedly have held that actions challenging the propriety of director conduct in carrying out corporate transactions are properly certifiable under both subdivisions (b)(1) and (b)(2)'"); *In re Wm. Wrigley Jr. Co. S'holders. Litig.*, C.A. No. 3750-VCL, 2009 WL 154380, at *4 (Del. Ch. Jan. 22, 2009) (stating a class action for injunctive relief and for additional disclosures is suitable for certification as a non-opt out class).  Moreover, the basis of the Settlement – the Supplemental Disclosures – benefitted all Class members equally.  Accordingly, the Class should be certified under Rules 23(b)(1) and 23(b)(2).

In sum, the Court should certify the Class for purposes of the proposed Settlement.

## III.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the settlement as fair, reasonable, and adequate and certify the Class for settlement purposes.

Dated: August 7, 2015                               LAW OFFICE OF ALFRED G. YATES, JR.

/s/ Gerald L. Rutledge
Alfred G. Yates, Jr. (PA 17419)
Gerald L. Rutledge (PA 62027)
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
(412) 391-5164
(412) 471-1033 (fax)
yateslaw@aol.com

OF COUNSEL:

BRODSKY & SMITH, LLC
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
(610) 667-6200

*Attorneys for Plaintiff James Elliott*